Filed 1/27/22  P. v. Rivera CA5
Opinion on remand from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>BERTHA RENEE RIVERA,<br><br>    Defendant and Appellant. | F076612<br><br>(Super. Ct. Nos. PCF335313, PCF335314, PCF335315)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Antonio A. Reyes, Judge.

Carla J. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

In 2017, a jury convicted appellant Bertha Renee Rivera of intimidating a witness (Pen. Code, § 136.1, subds. (a) & (b);[1] count 1), finding true that she acted maliciously, and used or threatened to use force (§ 136.1, subd. (c)). The jury also found true that she committed this crime for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)). The trial court found true that appellant had suffered prior convictions for which she had served prison terms (§ 667.5, subd. (b)).

Appellant's sentencing involved this matter and two companion cases. In one of the companion cases, appellant pleaded to a three-year enhancement under Health and Safety Code section 11370.2, subdivision (a). Altogether for the three cases, she received a determinate term of five years eight months. In this matter, she received a consecutive indeterminate term of eight years to life.

On August 4, 2020, we filed an opinion in this matter. We rejected appellant's claim that the prosecution violated *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) regarding the admission of gang evidence against her. We also concluded that the evidence was sufficient to support the gang enhancement. We rejected her assertion that the trial court erred when it prevented her from introducing evidence of alleged bias of a key prosecution witness. Finally, we rejected her claim of prosecutorial misconduct. (*People v. Rivera* (Aug. 4, 2020, F076612) [nonpub. opn.].)

In our prior opinion, however, we agreed with the parties that the one-year prior prison enhancements (§ 667.5, subd. (b)) must be stricken. We also agreed with appellant that her three-year enhancement under Health and Safety Code section 11370.2, subdivision (a), must be stricken. We remanded this matter for the trial court to resentence appellant, and for further proceedings in the companion cases. Because appellant no longer qualified for the enhancements, we determined it was impossible to

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

resentence her according to the stipulated sentence. Accordingly, we directed the trial court to vacate the plea bargain in the companion cases, and to allow appellant to withdraw her no contest pleas. In all other respects, we affirmed.

Appellant subsequently appealed to the California Supreme Court, and on October 28, 2020, the Supreme Court granted review. On September 15, 2021, the Supreme Court transferred this matter to this court with directions for us to vacate our prior decision and to reconsider the cause in light of *People v. Valencia* (2021) 11 Cal.5th 818 (*Valencia*).

On September 17, 2021, we vacated our prior opinion.

On November 1, 2021, appellant filed a supplemental brief regarding the impact of *Valencia*. Although it was given the opportunity, respondent failed to file a supplemental brief following remand from the Supreme Court.

In light of *Valencia*, we now determine that appellant's gang enhancement must be reversed.[2] We vacate appellant's sentence and remand this matter for further proceedings.

## BACKGROUND

We summarize the relevant portions of the trial evidence. We provide additional facts later in this opinion when relevant to the issues raised on appeal.

## I. Appellant's Son Shoots At A Residence.

In April 2016, someone fired a gun at a particular residence in Porterville, California. Law enforcement believed that Gilberto Amezcua, appellant's adult son, was responsible for that shooting. At trial the prosecution established that, when these events occurred, Amezcua was a gang member with "East Side," a subset of the Norteño street gang.

---

[2]     As we explain in greater detail later in this opinion, the prosecution may elect to retry the gang enhancement.

3.

## II.     The Search Of Appellant's Residence.

Detective Darin Cardoza investigated this shooting.  Cardoza had previous contact with Amezcua, and Cardoza focused on Amezcua as the shooter.  Cardoza knew that Amezcua resided with appellant, or frequented her residence.

Cardoza searched appellant's residence.  Inside her garage, he found some "taggings" and "monikers" written on a poster.  Photographs of that evidence were admitted at trial, and Cardoza explained to the jury how it was gang related.  Cardoza told the jury that he believed these gang-related writings probably belonged to Amezcua.  Cardoza, however, believed appellant was the "responsible party" at that residence.

## III.     Appellant Tried To Dissuade A Witness From Testifying Against Her Son.

The prosecution established that appellant threatened a potential witness, M.M., who is the mother of the victim whose residence had been fired upon.  M.M. lived next door to her daughter.  According to M.M., it was appellant's son, Amezcua, who had fired at her daughter's residence in April 2016.

The jury heard conflicting testimony from M.M. and appellant about appellant's intimidation of M.M.

### A.     M.M.'s testimony about appellant's intimidation.

According to M.M., appellant spoke with her in May 2016.  Appellant told M.M. that they "would end up in a bad place" if M.M. went to court about her son's alleged shooting.  Appellant told her that, if M.M. was scared of her son because he was in a gang and a "gang banger," then M.M. should really fear appellant.  According to M.M., appellant said she and her family were not just gang members, "they were part of the mafia."

M.M. told the jury that she understood "mafia" to mean "someone who is involved with drugs and is more dangerous than just a gang member."  She took appellant's threat to mean that, if she went to court, she and her family would be "shot up worse."

According to M.M., appellant had asked her who had given video of the shooting to the police. M.M. had told her that the police took the video. M.M. and appellant went to the victim's residence. M.M. showed appellant where appellant's son had allegedly shot at the residence belonging to M.M.'s daughter. They looked at "bullet holes" left on the outside and inside of that residence.

M.M. told appellant that she had a three-year-old granddaughter who could have been killed. Appellant said, " 'I don't care. I only care about my son.' " Appellant also stated that her son "was an asshole for aiming low instead of higher up." According to M.M., appellant told her that she wanted her son "to have shot higher up so that he would have hit the family inside."

Appellant asked M.M. who had called the police following Amezcua's shooting at the victim's residence. M.M. told her that she did not know who had called the police. According to M.M., appellant said, " 'I know people; lot of people that can hurt badly. They're just a bunch of pigs that care about nothing, but money, and the money that they can get by getting to people.' " M.M. told the jury that appellant was "angry all the time" during their conversation.

## B.    Appellant's testimony about her intimidation.

In contrast to M.M.'s testimony, appellant denied ever threatening M.M., but she admitted that she had asked M.M. not to testify against her son. Appellant believed that her son was facing a very long prison term.[3] She denied using the words "cholo[,]" "narco[,]" or "mafia" when speaking with M.M. She told the jury that, when she spoke with M.M., she was not trying to benefit the Northern gang. She said she did not realize it was wrong to talk with M.M. She denied that her son had directed her to speak with M.M.

---

[3]    When appellant was arrested in this matter, she spontaneously informed an officer that her son was facing 55 years in prison.

**IV.    The Evidence Regarding Appellant's Gang Association.**

Two detectives, Marciel Morales and Cardoza, testified as gang experts for the prosecution.  The two experts discussed the Norteño gang in general, and they explained the various Norteño subsets that operate in and around the City of Porterville.  Another prosecution witness, sergeant Mark Azevedo, also provided some testimony about gangs.

Cardoza testified about two predicate offenses involving Norteño gang members.  These offenses had occurred in the City of Porterville.  According to Cardoza, these predicate offenses showed examples of the primary activities for the Norteño gang in general, and all of its subsets in Porterville.[4]

Morales had known appellant and some of her sons since 1999.  According to Morales, appellant had never admitted that she was a gang member.  Likewise, Cardoza told the jury that appellant was not a gang member.  Cardoza, however, opined that she was a gang associate.

To establish appellant's gang association, the prosecution demonstrated that appellant had current and/or prior relationships with three men:

1.    Her son, Amezcua;

2.    A former acquaintance, Armando Zavala.  Morales provided testimony establishing that Zavala was a gang member in a Norteño subset called Varrios Central Poros (VCP).

3.    A former acquaintance, Jason Macias (Crazy J).  Sergeant Azevedo provided testimony that suggested Macias was a gang member.  According to Azevedo, he had seen a photograph of the word "Poros" on Macias's chest.  Azevedo testified that this was a gang-related tattoo.

---

[4]    People's exhibits 18, 19, 20 and 21 were admitted into evidence.  These documents were certified copies of the charges and convictions for the two predicate offenses.

At trial, Cardoza opined that, based on the trial testimony from Morales and Azevedo, appellant "affiliates with other gang members." Cardoza opined that appellant is a gang associate. The prosecutor provided Cardoza with a hypothetical that matched some of the facts from this trial. Cardoza opined that appellant acted to benefit the Norteño gang when she threatened M.M. and tried to keep her from testifying against her son, a known Norteño gang member. Based on the hypothetical presented to Cardoza, appellant's threats to M.M. would have benefited all of the Norteño subsets in Porterville.

Cardoza also noted that appellant had informed an officer in 2009 that "scraps" may have been responsible for a particular homicide.[5] Cardoza explained that this is a derogatory term used typically by Norteños to denote Sureños. According to Cardoza, appellant's use of this word showed some affiliation or association with the Norteño gang.

In contrast to the prosecution's evidence, appellant told the jury that she is not part of a gang, and she is not a Norteño gang member.[6] She denied being a Norteño associate.[7] Instead, she associates with her son. She said she has learned that her son is a gang member, and "he does things that I do not like or approve." She testified that she allows her son to go to her residence, but she does not allow him to do gang-related

---

[5]     The jury learned that, in 2009, an officer contacted appellant and her son, Amezcua, at appellant's residence. The officer was obtaining statements in a murder investigation. Appellant told the officer that she had heard "scraps" were responsible for shooting that particular victim.

[6]     Appellant admitted at trial that she had prior convictions for burglary, evading the police, and using drugs. She had served time in jail and prison. She explained that her drug addiction had been a factor in her prior behavior.

[7]     Appellant called a gang expert to testify on her behalf. According to the defense expert, appellant was neither a gang member nor a gang associate. An associate actively helps a gang. It takes more than being a mother of a gang member to be a gang associate. Likewise, dating a gang member is not enough. Instead, you have to actively do things or help. It was his opinion that this was not a gang crime done for the benefit of a gang.

7.

things in her house.  When she is away from home, Amezcua will have people there, but "when I come home, I make them leave."

Appellant told the jury that Amezcua was 26 years old, and she could not stop him from putting up posters in her garage.  She said the poster in her garage that contained gang references belonged to Amezcua.  She said he does not listen to her, and she had tried to talk to all of her sons about not getting into gangs.

Appellant denied having any gang tattoos.  She did have one little tattoo of a heart that she got when she was 14 years old.  She denied having any gang-related items in her bedroom.

Appellant testified that Macias (Crazy J) is not a gangster.  She said she had an incident with him in 2005 when they argued about another woman.  A struggle occurred.  During their altercation, Macias had a gun, which discharged.  Appellant was shot in her foot and she sought medical attention.

Appellant testified that, in 2006, she spent time with Zavala and they would ingest drugs together.  She said she did not date Zavala.  Instead, she described her relationship with him was a "bad mistake" and based on "bad choices."  Appellant told the jury that she had not dated anyone for 10 or 12 years.

## DISCUSSION

I.      **In Light Of *Valencia*, The Jury's True Finding Regarding The Gang Enhancement Must Be Reversed; The Prosecution May Elect To Retry This Sentencing Enhancement Allegation.**

In convicting appellant of intimidating M.M., the jury found true that appellant acted to benefit a criminal street gang.  (§ 186.22, subd. (b)(1).)  Because of this true finding, appellant's sentence was elevated to an indeterminate term of seven years to life in state prison.  (§ 186.22, subd. (b)(4)(C).)

In her prior briefing, appellant had argued that her gang enhancement must be reversed because the prosecution relied on testimonial hearsay in violation of *Sanchez*,

8.

*supra*, 63 Cal.4th 665.[8]  We had rejected those arguments.  (*People v. Rivera*, *supra*, F076612.)  In light of *Valencia*, however, we now agree that the jury's true finding must be reversed because the prosecution improperly and prejudicially relied on case-specific hearsay in violation of *Sanchez* to establish the gang enhancement.

## A.    Standard of review.

In *Sanchez*, *supra*, 63 Cal.4th 665, our Supreme Court held that "case-specific" statements related by a gang expert concerning a defendant's gang membership are inadmissible under California law if those statements are based on hearsay.  (*Id.* at p. 684.)  Such evidence must be independently established in court.  (*Ibid.*)  Further, "testimonial" hearsay statements must also be excluded under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), unless an exception applies.[9]  (*Sanchez*, *supra*, 63 Cal.4th at p. 685.)  Testimonial statements under *Crawford* "are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony.  Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial."[10]  (*Sanchez*, at p. 689.)  Improper admission of such evidence is error under the Federal Constitution.  (*Sanchez*, at p. 685.)

---

[8]    Appellant previously raised ineffective assistance of counsel to the extent her *Sanchez* claims were deemed forfeited.  Respondent, however, did not previously raise forfeiture.  Because we address these issues on their merits, we need not analyze any alleged ineffective assistance of counsel.

[9]    "Under *Crawford*, if an exception was not recognized at the time of the Sixth Amendment's adoption [citation], admission of testimonial hearsay against a criminal defendant violates the confrontation clause unless (1) the declarant is unavailable to testify and (2) the defendant had a previous opportunity to cross-examine the witness or forfeited the right by his own wrongdoing.  [Citations.]" (*Sanchez*, *supra*, 63 Cal.4th at p. 680.)

[10]    Our Supreme Court has clarified a testimonial statement has two requirements.  First, the hearsay statement must have been made with some degree of solemnity or

### B. Analysis.

#### 1. The elements necessary to establish the gang enhancement.

Under the law at the time this offense occurred, a gang enhancement applied when someone committed a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Former § 186.22, subd. (b)(1).) " 'In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a "pattern of criminal gang activity" by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called "predicate offenses") during the statutorily defined period.' [Citations.]" (*Sanchez*, *supra*, 63 Cal.4th at p. 698.)

On October 8, 2021, the Governor signed into law Assembly Bill No. 333 (2021-2022 Reg. Sess.), which became effective January 1, 2022. Under the current law, the term "criminal street gang" appearing in section 186.22 requires proof that members of a gang "collectively" engage in or have engaged in a pattern of criminal gang activity. (§ 186.22, subd. (f).)

#### 2. *Valencia* resolved a split of authority in California.

As discussed in our prior opinion, a split of authority previously existed in California regarding whether a gang expert's testimony about predicate offenses was considered general "background" information upon which an expert witness could generally rely, or whether such testimony entailed "case-specific" facts as contemplated by *Sanchez*. (*People v. Rivera*, *supra*, F076612.) *Valencia* resolved that dispute.

---

formality. Second, the primary purpose of the statement must pertain in some fashion to a criminal prosecution. (*People v. Gomez* (2018) 6 Cal.5th 243, 297.)

In *Valencia*, the Supreme Court acknowledged that, in gang cases, "drawing the line of demarcation between background and case-specific information can present challenges, as reflected by the different conclusions drawn by the Courts of Appeal regarding predicate offenses. Several cases have held that predicate offense evidence is merely background similar to other kinds of information about gangs, like their territory, symbols, and operations, that are generally accepted as true by experts in the field. [Citations.]"[11] (*Valencia*, *supra*, 11 Cal.5th at p. 835.) The *Valencia* court clarified that, as used in *Sanchez*, the phrase "general background information" refers to "expert knowledge derived from hearsay that is generally accepted as accurate by experts in the field." (*Valencia*, *supra*, 11 Cal.5th at p. 837, fn. 15.)

The Supreme Court clarified in *Valencia* that, for purposes of expert testimony, the terms " 'general background information' and 'case-specific facts' " distinguish "between hearsay that may be admitted because it is generally accepted by experts in the field, and facts that cannot be proven by hearsay because that reliability justification is absent. These latter case-specific facts must be proven through the testimony of a witness with personal knowledge or by other admissible evidence." (*Valencia*, *supra*, 11 Cal.5th at p. 837, fn. omitted.) It is the role of an expert witness "to help the jury understand the significance of case-specific facts proven by competent evidence, not to place before the jury otherwise unsubstantiated assertions of fact." (*Ibid.*)

The *Valencia* court held that, without independent admissible evidence of the particulars of a predicate offense, an expert's hearsay testimony cannot be used to supply them. (*Valencia*, *supra*, 11 Cal.5th at p. 838.) "In the absence of any additional

---

**11**    The high court in *Valencia* noted that "general testimony about a gang's behavior, history, territory, and general operations is usually admissible. [Citation.] The same is true of the gang's name, symbols, and colors. All this background information can be admitted through an expert's testimony, even if hearsay, if there is evidence that it is considered reliable and accurate by experts on the gang." (*Valencia*, *supra*, 11 Cal.5th at p. 838.)

11.

foundation, the facts of an individual case are not the kind of general information on which experts can be said to agree." (*Ibid.*) The high court concluded "that facts concerning particular events and participants alleged to have been involved in predicate offenses" constitute "case-specific facts that must be proved by independently admissible evidence." (*Id.* at p. 839.) In sum, the particular facts offered to prove predicate offenses "are not the sort of background hearsay information about which an expert may testify. Competent evidence of those particulars is required. A gang expert may still render an opinion regarding the gang membership of the perpetrator of a predicate offense in response to a proper hypothetical question based on premises established by competent evidence. [Citation.]" (*Valencia*, *supra*, 11 Cal.5th at p. 839, fn. omitted.)

In the present matter, the prosecution relied on case-specific hearsay from Cardoza to establish two predicate offenses. These predicate offenses were used, in part, to establish the gang enhancement. For both predicate offenses, Cardoza relayed the pertinent information from police records.

The first predicate offense which Cardoza discussed involved three Norteño gang members. These three were convicted of robbery and assault with a deadly weapon. These crimes occurred in the City of Porterville. Cardoza could not recall in which subset these gang members belonged. He agreed, however, that this predicate offense was an example of the primary activities of the Norteño gang and its subsets.

The second predicate offense which Cardoza discussed involved "an active West Side Poros gang member." This crime occurred in the City of Porterville. This gang member was convicted of assault with a deadly weapon. Cardoza agreed that this defendant belonged to the Norteño street gang, but specifically to the WSP subset. Cardoza also agreed that this crime was an example of the primary activities of the Norteño gang, and its subsets.

12.

This record does not establish that Cardoza had independent knowledge of the facts underlying the two predicate offenses. As such, a clear *Sanchez* violation occurred. (See *Valencia*, *supra*, 11 Cal.5th at p. 838.) We turn to the issue of prejudice.

### 3. The *Sanchez* error was prejudicial.

In *Valencia*, our high court explained the standard for evaluating prejudice. The improper admission of hearsay may constitute state law statutory error, which would ordinarily be assessed under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*Valencia*, *supra*, 11 Cal.5th at p. 840.) Under *Watson*, we inquire whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.) However, the federal constitutional standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) is used if the improperly admitted hearsay is also testimonial within the meaning of *Crawford*. (*Valencia*, *supra*, 11 Cal.5th at p. 840.) Under the *Chapman* standard, any error must be harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.)

Here, the *Chapman* standard applies. Cardoza relied on police reports to establish the predicate offenses. As *Sanchez* notes, contents of police reports, and narratives authored by investigating officers, represent "testimonial" hearsay unless they were made in the context of an ongoing emergency or for some primary purpose other than preserving facts for use at trial. (See *Sanchez*, *supra*, 63 Cal.4th at p. 694.)

Cardoza related to the jury facts he gathered from inadmissible hearsay sources, including police reports, about which he had no personal knowledge. Cardoza considered this information to be true and he related it to the jury as a reliable basis for his opinion. The jury was permitted to improperly rely on that hearsay to conclude the predicate offenses had been proven and that appellant acted with the intent to benefit the gang when she committed the charged crime. Based on this record, we cannot conclude that

13.

the error was harmless under the *Chapman* standard. Accordingly, the jury's true finding regarding the gang enhancement must be reversed.[12]

## II. Appellant May Be Retried On The Gang Enhancement Allegation.

In both her prior briefing and in her brief following remand, appellant maintains that insufficient evidence supports her gang enhancement. Although we have already determined that the gang enhancement must be reversed because the predicate offenses were based on case-specific hearsay in violation of *Sanchez*, we address this claim to ensure that a potential retrial is permissible following remand.

When reviewing the sufficiency of the evidence for purposes of deciding whether retrial is permissible, a reviewing court "must consider *all* of the evidence presented at trial, including evidence that should not have been admitted. '[W]here the evidence offered by the State and admitted by the trial court—whether erroneously or not—would have been sufficient to sustain a guilty verdict, the Double Jeopardy Clause does not preclude retrial.' " (*People v. Story* (2009) 45 Cal.4th 1282, 1296–1297, quoting *Lockhart v. Nelson* (1988) 488 U.S. 33, 34; see also *People v. Lara* (2017) 9 Cal.App.5th 296, 302, fn. 3.) We conclude that sufficient evidence exists permitting a retrial of the gang enhancement.

### A. Standard of review.

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the

---

[12] In light of this reversal, we need not address appellant's remaining arguments why reversal is warranted based on *Sanchez* and/or *Valencia*.

14.

evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60.)

## B. Analysis.

In her initial briefing with this court, appellant had raised two arguments to support her claim that insufficient evidence supported the gang enhancement. First, she had contended the evidence was insufficient to link her gang affiliation to the gangs involved in the predicate offenses. She had relied primarily on *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*). She had argued that the numerous subsets discussed in her trial "were not shown to have the required connection to the umbrella Norteño organization."

In her second argument, appellant had maintained that the evidence was insufficient to establish the primary activities of the gang.

Following remand, appellant now argues in her supplemental brief that Cardoza improperly opined that she was a gang affiliate. She contends that Cardoza relied on case-specific hearsay to support his opinion. She asserts that, in light of *Valenica*, all of these alleged errors were prejudicial under *Chapman*, and her judgment must be reversed.[13]

We previously rejected appellant's arguments and held that sufficient evidence supported the gang enhancement. (*People v. Rivera*, *supra*, F076612.) In light of *Valencia*, we now conclude that, although the gang enhancement must be reversed, sufficient evidence supports a retrial of that sentencing allegation if the prosecution so elects.

---

[13]     In her supplemental brief following remand, appellant contends that her "judgment" must be reversed. Appellant, however, does not challenge the guilty verdict in count 1, only the true finding regarding the gang enhancement.

## 1. The requirements under *Prunty*.

In *Prunty*, the prosecution's gang expert stated that the defendant was an admitted " 'Northerner,' or a Norteño gang member," and a member of the Detroit Boulevard Norteño " 'set.' " (*Prunty*, *supra*, 62 Cal.4th at p. 68.) According to the expert, the defendant's clothing, previous contacts with police, and possessions were consistent with Norteño gang membership. (*Ibid.*) The expert described the Norteños as a Hispanic gang, active in Sacramento and throughout California, and it had about 1,500 local members. (*Id.* at p. 69.) He testified that "Sacramento-area Norteños are not associated with any particular 'turf' but are instead 'all over Sacramento' with 'a lot of subsets based on different neighborhoods.' " (*Ibid.*) Regarding predicate offenses, the gang expert relied on crimes committed by other gang members from other Norteño subsets, i.e., the Varrio Gardenland Norteños and the Varrio Centro Norteños. The expert testified that these subsets called themselves Norteños. (*Ibid.*) The prosecution produced no specific evidence showing the subsets identified with a larger Norteño group. The expert also did not testify that the Norteño subsets that committed the predicate offenses shared a connection with each other, or with any other Norteño-identified subset. (*Ibid.*)

*Prunty* held that the prosecution's evidence was legally insufficient to prove that the defendant's gang committed the predicate offenses. (*Prunty*, *supra*, 62 Cal.4th at p. 85.) Although the subsets who committed the predicate offenses were described as Norteños, no evidence connected these groups to one another, and nothing connected them to the "overarching Sacramento-area Norteño criminal street gang." (*Id.* at p. 82.) No evidence tended to show "collaboration, association, direct contact, or any other sort of relationship" among the subsets which the expert described. (*Ibid.*) Nothing permitted an inference of an associational or organizational connection among the subsets. (*Ibid.*)

In this matter, Cardoza and Morales were both deemed gang experts, and they testified regarding the Norteño gang. Three "clicks" of Norteños operate in Porterville: (1) East Side; (2) Central; and (3) West Side. Each "click" has its own subsets. East Side

has (1) the East Side Poros and (2) the East Side Varrio Poros ("ESP"). Central has (1) the Central Poros and (2) the Varrio Central Poros. West Side has (1) the West Side Poros ("WSP") and (2) the Varrio West Side Poros.

The jury learned that the gang members in the Porterville subsets are members of the larger Norteño gang in Tulare County, which is governed by the Nuestra Familia. The prosecutor asked Cardoza if the Norteño subsets in Tulare County "collaborate, communicate and work together in furtherance of the gang as a whole?" Cardoza answered affirmatively. He explained that, during a law enforcement operation known as "Redsol," a particular gang member was identified as the person in charge of "South County" and this person reported to a Nuestra Familia member.[14] During this operation, it was determined that three channels in Tulare County were used to provide information from the Nuestra Familia to the street, or vice versa.

Defense counsel raised objections under hearsay and *Sanchez* to this testimony. The trial court overruled those objections. Cardoza testified that Norteño gang members all follow certain rules and orders. A chain of command exists within the Norteño street gang that linked to the Nuestra Familia.

Cardoza said the Norteño subsets in Porterville share and defend the same turf, and they work together to push the Sureños from the city. The three subsets all associate

---

**14** Appellant asserts that Cardoza's testimony about operation Redsol represented inadmissible testimonial hearsay. In our prior opinion we disagreed, determining that Cardoza's testimony about operation Redsol represented general background information. (*People v. Rivera*, *supra*, F076612.) In light of *Valencia*, however, we now need not fully respond to this issue. Instead, we have already concluded that the jury's true finding regarding the gang enhancement must be reversed. The double jeopardy clause does not preclude retrial in this situation because the evidence admitted by the trial court, despite some of it having been erroneously admitted in violation of *Sanchez*, was sufficient to find true the gang enhancement allegation. (See *People v. Story*, *supra*, 45 Cal.4th at pp. 1296–1297; *People v. Lara*, *supra*, 9 Cal.App.5th at p. 302, fn. 3.)

with the color red and the number 14. They share the same rivals, i.e., the Sureños and the Northern Riders dropout gang.

Cardoza opined that appellant was a gang associate. After being presented with a hypothetical that mirrored some of the facts in this matter, Cardoza opined that the person in appellant's position acted to benefit and further the Norteño gang. Cardoza agreed that this hypothetical person's conduct would have benefited all of the subsets in the City of Porterville, and not just the shooter's subset, i.e., the East Side Varrio Poros.

In contrast to *Prunty*, the prosecution presented evidence in this matter that established appellant was affiliated with the same gang, i.e., the Norteños, whose members had committed the predicate offenses. Moreover, sufficient evidence demonstrated an inference of an associational or organizational connection among the three Norteño subsets in Porterville. (See *Prunty*, *supra*, 62 Cal.4th at p. 82.) Cardoza and Morales established that these subsets identified with the larger Norteño organization, and those gang members were all considered Norteños. *Prunty* is distinguishable and it does not preclude a possible retrial of the gang enhancement. Although some of the People's evidence was erroneously admitted at trial, sufficient evidence exists to support a retrial of the gang enhancement. (See *People v. Story*, *supra*, 45 Cal.4th at pp. 1296–1297; *People v. Lara*, *supra*, 9 Cal.App.5th at p. 302, fn. 3.)

## 2. The primary activities.

In her second argument, appellant had previously asserted that Cardoza was not very experienced when he testified in this matter. She noted that Cardoza had been a police officer for less than five years, and he had only been investigating gang crimes for about two years prior to his testimony. She argued that Cardoza failed to explain how he determined her gang's primary activities. She renewed her assertions under *Sanchez*, contending that Cardoza merely relied upon hearsay. She also cited *In re Alexander L.* (2007) 149 Cal.App.4th 605. She maintained that Cardoza's testimony was insufficient

18.

to establish the required primary activities to establish a criminal street gang. We continue to disagree with appellant's assertions.

To establish a gang's primary activities, the trier of fact may look to both the past and present criminal activities of the gang. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) Isolated criminal conduct, however, is not enough. "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at p. 324.) Expert testimony based on an adequate factual foundation might also be sufficient. (*Ibid.*)

In *In re Alexander L.*, the opinion which appellant cites, a deputy sheriff in a gang enforcement unit contacted a juvenile and questioned him about his status in a particular street gang. The juvenile was wearing gang clothing and he was in a known gang gathering area. (*In re Alexander L.*, *supra*, 149 Cal.App.4th at p. 609.) The juvenile admitted to the deputy that he had spray painted the name of his alleged gang in three locations. The juvenile also disclosed that he had been given a gang moniker. A petition was filed against the juvenile alleging three counts of vandalism, and alleging that these offenses were committed for the benefit of, at the direction of, or in association with the juvenile's street gang, with the intent to promote, further, or assist the gang under section 186.22, subdivision (d). (*In re Alexander L.*, at p. 609.) The juvenile court denied a motion to dismiss the gang enhancement. (*Ibid.*) The appellate court, however, determined that error had occurred.

The appellate court commented that no specifics were elicited about the circumstances of the gang's crimes, or how the deputy had obtained his information. (*In re Alexander L.*, *supra*, 149 Cal.App.4th at pp. 611–612.) The deputy also did not directly testify that criminal activities constituted the gang's primary activities. Indeed, on cross-examination, the deputy stated that the vast majority of cases connected to this gang that he had experienced were graffiti related. (*Id.* at p. 612.) The appellate court

19.

concluded that the deputy's testimony lacked an adequate foundation. (*Ibid.*) No information was elicited from him establishing the reliability of his testimony. "It is impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." (*Ibid.*)

Finally, the court in *In re Alexander L.* rejected the respondent's argument that the admission of two predicate crimes had been enough, along with the deputy's general testimony about the gang's crimes, to establish the gang's primary activities. (*In re Alexander L.*, *supra*, 149 Cal.App.4th at p. 613.) To the contrary, the appellate court reiterated that the deputy had not provided a basis for his testimony that he knew members of the juvenile's alleged gang had been involved in certain crimes. Without more, the two predicate offenses did not provide substantial evidence that gang members had consistently and repeatedly committed criminal activity listed in the gang statute as required under *Sengpadychith*, *supra*, 26 Cal.4th at p. 324. (*In re Alexander L.*, *supra*, 149 Cal.App.4th at p. 614.) The appellate court reversed the true finding as to the gang enhancement allegation. (*Ibid.*)

*In re Alexander L.* is factually distinguishable from the present matter. Cardoza explained his background in law enforcement, including his training and experience with gangs. The trial court designated Cardoza as a gang expert. Unlike the deputy in *In re Alexander L.*, Cardoza explained that he was personally familiar with the local gangs operating in Tulare County and the City of Porterville. Part of his job duty was to remain updated on gang activities in Porterville. He had talked to hundreds of Norteño gang members, and he had investigated about 25 crimes, and probably more, in which Norteño gang members were suspects. Cardoza testified that the primary activities of the Norteños include drug sales, fraud, robbery, shootings, stabbings, various assaults, and murder. Cardoza stated that he had investigated these various crimes by Norteño gang

members, and he opined that they are repeated and consistent activities of the Norteño gang.

The concerns in *In re Alexander L.* are lacking here. Cardoza's testimony provided sufficient foundation to make his opinions reliable in this regard. Cardoza's testimony about the primary activities of the Norteño gang, coupled with the additional two predicate offenses which Cardoza discussed (whose testimony is now deemed inadmissible based on case-specific hearsay), show that Norteño gang members have consistently and repeatedly committed criminal activity listed in the gang statute. (See *Sengpadychith*, *supra*, 26 Cal.4th at p. 324.) This record demonstrates that, even though some of this trial evidence should have been excluded, sufficient evidence exists to support a retrial of the gang enhancement. (See *People v. Story*, *supra*, 45 Cal.4th at pp. 1296–1297; *People v. Lara*, *supra*, 9 Cal.App.5th at p. 302, fn. 3.)

### 3. The sufficiency of the evidence in light of *Valencia*.

In her brief following remand, appellant asserts that Cardoza relied on inadmissible case-specific hearsay to opine that she was a gang affiliate. She argues that Cardoza related to the jury facts that he gleaned from inadmissible hearsay sources, including police reports. Appellant contends that Cardoza had no personal knowledge about some of these facts. She asserts that the jury was improperly permitted to rely on that hearsay to conclude the predicate offenses had been proven, and that appellant had acted with an intent to benefit the gang when she committed the charged crime. She maintains that her judgment must be reversed.

We need not fully respond to all of appellant's arguments. Instead, we have concluded that the gang enhancement must be reversed. The issue before us is whether sufficient evidence exists which permits retrial of the gang enhancement. This record contains such evidence.

At trial, Cardoza opined that, based on the trial testimony from Morales and Azevedo, appellant "affiliates with other gang members." Cardoza opined that appellant is a gang associate. The prosecutor provided Cardoza with a hypothetical that matched some of the facts from this trial. Cardoza opined that appellant acted to benefit the Norteño gang when she threatened M.M. and tried to keep her from testifying against her son, a known Norteño gang member. Based on the hypothetical presented to Cardoza, appellant's threats to M.M. would have benefited all of the Norteño subsets in Porterville.

Cardoza also noted that appellant had informed an officer in 2009 that "scraps" may have been responsible for a particular homicide.[15] Cardoza explained that this is a derogatory term used typically by Norteños to denote Sureños. According to Cardoza, appellant's use of this word showed some affiliation or association with the Norteño gang.

In light of *Valencia*, it is apparent that some of the People's evidence regarding the gang enhancement was erroneously admitted at trial. However, the double jeopardy clause does not preclude retrial in this situation because the evidence admitted by the trial court, despite some of it having been erroneously admitted in violation of *Sanchez*, was sufficient to find true the gang enhancement allegation. (See *People v. Story, supra,* 45 Cal.4th at pp. 1296–1297; *People v. Lara*, *supra*, 9 Cal.App.5th at p. 302, fn. 3.) Accordingly, we remand for further proceedings and the prosecution may elect to retry the gang enhancement.

---

**15** The jury learned that, in 2009, an officer contacted appellant and her son, Amezcua, at appellant's residence. The officer was obtaining statements in a murder investigation. Appellant told the officer that she had heard "scraps" were responsible for shooting that particular victim.

22.

**III. The Trial Court Did Not Abuse Its Discretion In Prohibiting Appellant From Introducing Evidence About M.M.'s Family.**

Appellant asserts that the trial court violated her constitutional rights to confront and present a defense when the court excluded evidence of M.M's bias. In general, the defense sought to show that M.M. had a motive to lie because at least one of her sons was a Sureño gang member. In addition, the defense wanted to introduce evidence showing that the residence of M.M.'s daughter was a known Sureño gang hangout.

**A. The relevant proceedings below.**

In pretrial proceedings, the prosecutor moved to suppress evidence that M.M.'s children were in prison. The trial court ruled such evidence was not relevant, but said it would consider the issue later if it arose.

During M.M.'s trial testimony, defense counsel sought to cross-examine her and admit evidence that M.M.'s son is a Sureño gang member. Outside the presence of the jury, defense counsel stated, "We have documented proof that [M.M.] has been contacted by the police regarding her family's involvement in gangs. We know that her son … is a known gang member and is doing prison time for gang crimes."

The court asked about the relevancy of that evidence. Defense counsel responded that the prosecution was casting doubt on appellant with gang evidence. "How can we then not impeach their witness's credibility when what they're using to cast a bad light on my client, well, that same bad light exists to this witness. So how can what's good for one not be good for the other?"

The court asked if the defense had any evidence that M.M. was involved in gang activity. Defense counsel admitted that no evidence showed M.M.'s active involvement in gangs, but, instead, she was a gang associate. The court sustained the prosecutor's unspecific objection to this evidence.

Defense counsel asked to make a record. The following exchange occurred:

"[DEFENSE COUNSEL]: Here, the testimony of gang expert Cardoza will be that my client is not a gang member, but that she's an associate, and that she's an associate because of her son. She associates with gangs because of her son. Here, [M.M.] is guilty of that same thing. She associates with gangs because her sons are in gangs.

"THE COURT: Okay. The witness is not on trial, [defense counsel]. Objection's sustained."

A short time later, defense counsel noted to the court that M.M.'s involvement or association in gangs would arise when Cardoza (or possibly other witnesses) testified. According to defense counsel, M.M.'s name was in a police report and she was mentioned in a gang incident. Defense counsel stated that M.M. was contacted because her children had a "connection with Southern gangs." The court stated it would deal with that issue if and when it occurred. The prosecutor asked the court to admonish the defense not to ask questions that would violate the court's ruling. The court advised, "The objection was sustained regarding anything having to do with [M.M.'s] family or any allegations regarding her family being involved in, quote, unquote, 'gangs'. That's not before the Court. [M.M.] is not on trial, okay?"

M.M.'s cross-examination resumed. Defense counsel later asked her if it was true that her house had been shot at in the past. The trial court sustained the prosecutor's relevancy objection. Outside the jury's presence, the prosecutor asked the court to make its ruling clear that the defense could not discuss M.M.'s gang association or any prior shootings. Defense counsel responded that this evidence was relevant. Defense counsel also stated his intent to show that M.M. "was getting substantial financial help from the District Attorney to remove her from that home situation." Defense counsel argued that these statements were relevant to M.M.'s credibility and to show her bias. According to defense counsel, M.M. had a reason to possibly mislead the jury and make untruthful statements. Defense counsel said he was allowed to ask questions regarding bias, and M.M. "would clearly have a bias against [appellant]." He believed that past shootings were relevant to why M.M. received compensation from the district attorney. The court

24.

stated it understood that the defense wanted to "delve into other incidents regarding apparently [M.M.'s] family." The court said it had previously sustained an objection regarding these issues. "You are instructed not to ask questions regarding any of those incidents that involve this case."

The court noted that, during opening statements, the defense had admitted to the jury that the shooting incident at the victim's house had occurred. According to the court, that shooting was not the issue. Instead, the issue was the alleged intimidation of M.M. The court stated that "anything else is not relevant. Because if we get into that, we're opening the door to an immense number of issues that are not, you know, relevant. Okay? Simple as that." The court instructed the parties to not go into any other incidents except the one shooting that occurred, and appellant's alleged intimidation of M.M.

On redirect, M.M. testified that daily shootings occurred at the house after appellant was arrested. She told the jury that she relocated with state assistance. Outside the jury's presence, defense counsel argued that the prosecutor was asking about shootings that had occurred at M.M.'s house after the alleged intimidation and, thus, he should be allowed to ask about prior incidents. The court observed that it had already ruled on the prior incidents. Defense counsel insisted that "parity" was required. The prosecutor pointed out that "a trial doesn't work to where, well, they were able to get something in, so I can get something in." Instead, the Evidence Code must be followed. The court concluded that the "door" had not been opened regarding prior incidents. However, if the prosecutor delved into subsequent incidents, then the defense could as well.

During cross-examination of Cardoza, defense counsel attempted to elicit testimony that the residence belonging to M.M.'s daughter had been shot at in the past, and it had experienced "gang-related problems." The court sustained the prosecutor's objections based on relevancy. Outside the presence of the jury, defense counsel maintained that this testimony was admissible to impeach M.M.'s credibility. Defense

25.

counsel asserted that he should be permitted to impeach M.M.'s character with evidence that she associates with gang members, and she had trouble at her home because of gangs. The court asked if M.M. had any prior gang-related convictions. Defense counsel admitted that M.M. did not have any such convictions. The court denied the defense an opportunity to impeach M.M. The court stated it had gone over these issues before, and M.M. was not on trial. Defense counsel insisted that he should be permitted to ask about prior alleged shootings at the victim's residence. The court asked about the relevancy. Defense counsel stated it was relevant because the victim's residence was a known Sureño hangout, and that evidence would impeach M.M. The court said, "You are not getting into that." A short time later, the prosecutor commented that any evidence suggesting that the victim's house was connected with Sureños was "totally misleading" because the victim "was rumored to be dating an alleged person who associates with [Sureños]. [M.M.'s] kids aren't [Sureños]. There is no evidence of that." Defense counsel countered that M.M's son "is doing time because he's a Southern Gang member." The court said, "You are not getting into that."

## B.     Standard of review.

We review relevancy and Evidence Code section 352 rulings for abuse of discretion. (*People v. Rowland* (1992) 4 Cal.4th 238, 264; *People v. Clair* (1992) 2 Cal.4th 629, 660.) We will not disturb a trial court's decision on appeal unless "the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125; see *People v. Williams* (1998) 17 Cal.4th 148, 162 [abuse of discretion review asks whether ruling in question falls outside bounds of reason under applicable law and relevant facts].)

## C.    Analysis.

Appellant notes that M.M. was impeached during portions of her testimony.  The jury learned that M.M. had a prior conviction for petty theft.  Cardoza testified that, when he interviewed M.M., she never told him that appellant had used the terms "cholo[,]" "narco[,]" or "mafia" when M.M. reported appellant's threats to her.  The jury heard from Cardoza that the Sureños call themselves the "Mexican Mafia" and Norteños would not describe themselves as "mafia."  The jury learned that M.M. never told the police that appellant said all police are pigs and they would not help her.  The jury also learned that M.M. did not call the police at the time appellant had threatened her.

Appellant observes that M.M. was the only witness regarding appellant's actions. Appellant asserts that, had the trial court permitted the introduction of evidence showing a possible connection between M.M. and the rival Sureño gang, the defense could have impeached her credibility by showing a bias.  Appellant argues that the court's evidentiary rulings prejudicially prevented her from confronting M.M. and from presenting a complete defense.

We disagree that the trial court abused its discretion.  M.M.'s credibility as a witness was relevant in this trial, and appellant had the right to show her potential bias. (Evid. Code, §§ 351, 780, subd. (f), 785.)  However, the defense offered no evidence that M.M. had suffered prior gang-related convictions or that she was a gang member.  In fact, the defense conceded that it had no evidence M.M. was even involved in gang activity.  Appellant's proposed evidence did not show or reasonably suggest that M.M. had an affiliation with the rival Sureño gang.  In short, the defense's proposed gang-related evidence regarding M.M.'s family had very little probative value regarding M.M.'s potential bias.  We reject appellant's assertions otherwise.

A trial court may exclude otherwise admissible evidence if its probative value is substantially outweighed by its prejudicial effect; that is, if its admission would result in

27.

the undue consumption of time, a danger of undue prejudice, confusion about the issues or the danger of misleading the jury. (Evid. Code, § 352.)

Given the minimal probative value of the evidence offered to establish M.M.'s bias, the trial court acted well within its discretion to exclude this evidence. We agree with the court's implied finding that the defense's proposed evidence was more prejudicial than probative.[16] The court had valid concerns that, permitting the defense to introduce evidence about gang members in M.M.'s family, or how members in her family had a gang connection, would open the door to "an immense number of issues" that were ultimately not relevant.

Under these circumstances, the court's evidentiary rulings were not arbitrary, capricious or patently absurd. (See *People v. Rodrigues*, *supra*, 8 Cal.4th at pp. 1124–1125.) Appellant's proposed evidence about M.M.'s alleged bias would have necessitated an undue consumption of time but offered, at best, only marginally probative value regarding M.M.'s credibility. Thus, we cannot declare that the court's evidentiary rulings fell outside the bounds of reason under the applicable law and the relevant facts. (See *People v. Williams*, *supra*, 17 Cal.4th at p. 162.) Consequently, an abuse of discretion did not occur.[17] Therefore, appellant's assertions are without merit, and this claim fails.

## IV. The Prosecutor Did Not Commit Misconduct During Rebuttal Argument.

Appellant claims that the prosecutor committed prejudicial misconduct during rebuttal closing argument. During rebuttal, the prosecutor stated that the charge in count 1, intimidating a witness in violation of section 136.1, subdivision (a) or (b), was

---

[16] The trial court was not required "to place on the record the process by which it concluded that the probative value of the evidence outweighed its prejudicial impact .…" (*People v. Catlin* (2001) 26 Cal.4th 81, 122.)

[17] Because the trial court did not abuse its discretion, we will not address appellant's arguments regarding prejudice.

violated "right out the gate" when appellant went to M.M.'s residence. The prosecutor noted that appellant admitted on the witness stand that she did not want M.M. to go to court. The defense objected that the prosecutor was misstating the law. The court overruled that objection.

### A. Standard of review.

To prevail on a claim of prosecutorial misconduct based on remarks to the jury, a defendant must show a reasonable likelihood the jury understood or applied the disputed comments in an improper or erroneous manner. (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).) We must examine the prosecutor's entire argument and the jury instructions. (*Ibid.*)

### B. Analysis.

We reject appellant's contention that the prosecutor misstated the law. Appellant's arguments fail to address the entire closing argument and the jury instructions.

The instructions provided to the jury in this matter tracked the statutory elements required to prove a violation in count 1 of section 136.1, subdivision (a) or (b). With CALCRIM No. 2622, the jury was instructed that, to find appellant guilty in count 1, the prosecution had to prove that (1) she "maliciously tried to prevent or discourage" M.M. "from attending or giving testimony at a preliminary hearing or jury trial"; *or* (2) she "maliciously tried to prevent or discourage" M.M. "from cooperating or providing information so that a Complaint/Information could be sought and prosecuted and from helping to prosecute that action." The jury was further instructed that M.M. had to be a witness. In addition, it was required that appellant knew that she (appellant) "was trying to prevent or discourage" M.M. "from attending or giving testimony or causing the prosecution and intended to do so."

29.

During her initial closing argument, and prior to her disputed statements during rebuttal, the prosecutor reviewed with the jury the required elements in count 1. The prosecutor informed the jurors that she had to prove each of the requirements set forth in CALCRIM No. 2622, and she asserted that the elements were met. She reminded the jury that appellant had admitted going to M.M. and speaking with her. The prosecutor emphasized that appellant made gang references when attempting to dissuade M.M. from testifying. According to the prosecutor, appellant threatened M.M., and it was clear that appellant did not want M.M. to testify in court against her son, Amezcua.

Towards the close of her opening comments to the jury, the prosecutor reviewed the verdict form for count 1. The prosecutor reminded the jurors that she had gone over the elements for that offense with them. The prosecutor argued that, based on the evidence, the jury should find appellant guilty in count 1.

Finally, during her rebuttal argument (and just after she made her disputed statements), the prosecutor reminded the jury that appellant had gone over to M.M.'s residence and told her not to testify. At the end of rebuttal argument, the prosecutor asked the jury to find appellant guilty in count 1, and find true the special allegations. "Hold her responsible for her actions; the threats she made to [M.M.]; the fact that she knew what she was doing and took those conscious deliberate steps and actions to make them effective. I'm asking you to find her guilty. Thank you."

Based on this record, the prosecutor did not misstate the law. Instead, both the prosecutor and the court provided the required elements to the jury for a conviction in count 1. The prosecutor explained to the jury how those elements were met. It is not reasonably likely that the jury understood or applied the prosecutor's isolated disputed comments in an improper or erroneous manner. (See *Centeno*, *supra*, 60 Cal.4th at p. 667.) Accordingly, prosecutorial misconduct did not occur, and this claim fails.

## V. Appellant's Prior Prison Enhancements Must Be Stricken.

In a bifurcated proceeding, the trial court found true that appellant had suffered prior convictions for which she had served prison terms (§ 667.5, subd. (b)). As part of her indeterminate term, the court imposed a one-year prior prison term enhancement. In her determinate term involving the companion cases, the court stayed the three prior prison term enhancements.

We agree with the parties that all of appellant's prior prison enhancements (§ 667.5, subd. (b)) must be stricken.[18] In October 2019, the Governor signed into law Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill 136). (*People v. Lopez* (2019) 42 Cal.App.5th 337, 340.) This amended section 667.5, subdivision (b), which deals with prior prison enhancements. Following the amendment, prior prison enhancements only occur if the prior prison term was for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). (*People v. Lopez*, *supra*, 42 Cal.App.5th at pp. 340–341.)

We agree with the parties that none of appellant's prior prison terms were for sexually violent offenses. We also agree that this amendment applies retroactively to appellant because her case is not yet final. As such, appellant benefits from Senate Bill 136. Thus, we remand this matter for the trial court to strike the enhancements under section 667.5, subdivision (b), and to resentence her in case number PCF335314. As we explain below, however, appellant's plea agreement in the companion cases must be vacated because the stipulated sentence can no longer be imposed.

---

[18] Respondent initially asserted that appellant had forfeited any challenge to the legality of the imposed enhancements under section 667.5, subdivision (b). In supplemental briefing, however, respondent conceded that appellant benefits from Senate Bill No. 136. As such, we need not address alleged ineffective assistance of counsel.

**VI.  The Three-Year Enhancements Under Health and Safety Code Section 11370.2 Must Be Stricken And The Plea Agreement Must Be Vacated.**

Appellant was sentenced in two companion cases.  She had entered no contest pleas to resolve these other matters.  She received an aggregate determinate term of five years eight months.

In one of the companion cases, No. PCF335313, appellant pleaded no contest to the possession for sale of a controlled substance in violation of Health and Safety Code section 11378 (count 1).  She also pleaded no contest to the transportation for sale of a controlled substance in violation of Health and Safety Code section 11379, subdivision (a) (count 2).  For both charges, appellant pleaded to a three-year enhancement under Health and Safety Code, former section 11370.2, subdivision (a).  When appellant entered into this plea agreement, the parties noted that appellant's "maximum exposure" in the companion cases would be five years eight months.

In companion case No. PCF335313, appellant was sentenced to prison for five years.  This was comprised of the low term of two years for transporting a controlled substance for sale (Health & Saf. Code, § 11379, subd. (a); count 2), along with the three-year enhancement under Health and Safety Code, former section 11370.2, subdivision (a).  The court stayed a 16-month sentence in count 1 for possession of a controlled substance for sale (Health & Saf. Code, § 11378), plus an additional three-year enhancement (Health & Saf. Code, former § 11370.2, subd. (a)).  The court also stayed a one-year prior prison enhancement (§ 667.5, subd. (b)).

In companion case No. PCF335315, appellant was sentenced to eight months in state prison for illegal possession of ammunition (§ 30305, subd. (a)(1)).  This sentence was consecutive to the sentence imposed in the companion case above.

For the present case that went to trial (case No. PCF335314), appellant was sentenced to seven years to life for using force or fear to intimidate M.M. (§ 136.1, subd. (c)(1)).  The life sentence resulted because of the gang enhancement (§ 186.22,

subd. (b)(4)(C)). She also received a one-year prior prison enhancement (§ 667.5, subd. (b)). This sentence was consecutive to the sentence imposed in companion case No. PCF335315.

While this appeal was pending, the Legislature enacted Senate Bill No. 180 (2017–2018 Reg. Sess.) (Senate Bill 180). Senate Bill 180 became effective on January 1, 2018. (Stats. 2017, ch. 677, § 1.) Senate Bill 180 reduced the number of sentencing enhancements under Health and Safety Code section 11370.2, subdivision (a). Under the current law, a three-year enhancement may now be imposed only for a prior conviction for sales of narcotics *involving a minor* in violation of Health and Safety Code section 11380.

It is undisputed that, following Senate Bill 180, appellant no longer qualifies for the three-year enhancements under Health and Safety Code section 11370.2, subdivision (a). She asserts that, despite her plea agreement, these enhancements must be stricken from her sentence.[19] Respondent concedes that Senate Bill 180 retroactively applies to appellant. Respondent, however, argues that this court should not strike appellant's sentence enhancements because appellant entered into a negotiated plea bargain. According to respondent, the prosecution will be prejudiced if appellant is allowed to reduce her sentence by more than half based on an unanticipated change in the law. In the alternative, respondent asserts that, if the three-year enhancements are stricken, then the prosecution should be given an opportunity to restore the original

---

**19** Appellant raises ineffective assistance of counsel to the extent this claim is deemed forfeited. Respondent, however, does not raise forfeiture for this particular sentencing issue. Because we address this issue on its merits, we need not analyze any alleged ineffective assistance of counsel.

charges and enhancements unaffected by Senate Bill 180, and proceed to trial or a new negotiated disposition.[20]

We agree with appellant that, despite the plea agreement, she benefits from Senate Bill 180. The general rule is that a plea bargain implicitly accounts for future changes to the law. (*Doe v. Harris* (2013) 57 Cal.4th 64, 73.) "If parties to a plea agreement want to insulate the agreement from future changes in the law they should specify that the consequences of the plea will remain fixed despite amendments to the relevant law." (*People v. Wright* (2019) 31 Cal.App.5th 749, 756.)

Effective January 1, 2020, our Legislature enacted section 1016.8. This statute declares that a plea "is not knowing and intelligent" if the bargain requires a defendant to generally waive unknown future benefits of legislative enactments, initiatives, appellate decisions, or other changes in the law that may occur after the date of the plea. (§ 1016.8, subd. (a)(4).) Under this new law, "[a] provision of a plea bargain that requires a defendant to generally waive future benefits of legislative enactments, initiatives, appellate decisions, or other changes in the law that may retroactively apply after the date of the plea is void as against public policy." (*Id.* at subd. (b).)

Nothing in this record demonstrates that appellant's plea agreement required her to forego the right to appeal a sentencing issue. In any event, any such express waiver is now void in California. Consequently, we reject respondent's assertion that, because this was a plea bargain, it is improper to strike the contested enhancements.

Other courts faced with a similar situation have remanded the matter for resentencing, provided that the aggregate term does not exceed the stipulated sentence. (See *People v. Wright*, *supra*, 31 Cal.App.5th at p. 756; *People v. Calderon* (1993) 20 Cal.App.4th 82, 88 ["[i]t is perfectly proper for [the appellate] court to remand for a

---

[20] Respondent made these arguments before the parties filed supplemental briefing regarding Senate Bill 136. Following Senate Bill 136 and Senate Bill 180, there are no longer any sentence enhancements involved in the companion cases.

complete resentencing after finding an error with respect to part of a sentence"]; *People v. Castaneda* (1999) 75 Cal.App.4th 611, 614 [remand for resentencing proper where original sentence contained unauthorized enhancement].)

At first glance, it would appear appropriate for the trial court to resentence appellant in the companion cases so long as the aggregate term does not exceed the stipulated sentence. At sentencing, both the court and the prosecutor noted that, if the three-year enhancement under Health and Safety Code section 11370.2 was reversed in companion case No. PCF335313, the stipulated sentence was still reachable. The court specifically stated that, if this three-year enhancement was somehow inappropriate, "my intent is to somehow fashion a term that would be consistent with the total term of [five] years, [eight] months for [the] determinate term if that issue comes up again." However, because of Senate Bill 136 and Senate Bill 180, the parties' stipulated sentence of five years eight months can no longer be imposed.[21]

In her reply brief, appellant originally took the position that the plea agreement should not be set aside, and she asserted that *Harris v. Superior Court* (2016) 1 Cal.5th 984 (*Harris*) controlled. We disagree. The *Harris* court held that the People were not entitled to set aside a plea agreement when the defendant sought to have his sentence recalled under Proposition 47. (*Harris*, *supra*, at p. 993.) We agree with respondent that *Harris* is distinguishable. Appellant's sentence has not been reduced because of Proposition 47. Instead, because of Senate Bill 136 and Senate Bill 180, the aggregate sentence which the parties negotiated can no longer be imposed.

---

[21] Without the enhancements, the maximum sentence appellant could receive in the companion cases is *five years four months*. This is based on an upper term of four years for violation of Health and Safety Code section 11379, subdivision (a); a consecutive one-third the middle term of eight months for violation of Health and Safety Code section 11378; and a consecutive one-third the middle term of eight months for illegal possession of ammunition (§§ 30305, subd. (a)(1), 1170, subd. (h)(1)). This assumes that the sentence for the second violation under the Health and Safety Code must not be stayed under section 654.

In her supplemental opening brief, appellant concedes that, if her plea agreement is deemed invalid because the one-year prior prison enhancements are stricken, then this matter should be remanded for resentencing in conformance with the prior stipulated sentence. In the alternative, she contends that she should be allowed to withdraw her plea and proceed to trial in the companion cases.

Contract principles are applied regarding agreements between the prosecution and a criminal defendant. (See *People v. Paredes* (2008) 160 Cal.App.4th 496, 506–507 [plea agreement].) A promise that is part of the inducement or consideration must be fulfilled in order to have a valid agreement. (*Id.* at p. 507.) When the agreement cannot be fulfilled, the parties should be returned to their original positions. (*People v. Superior Court (Sanchez)* (2014) 223 Cal.App.4th 567, 577.)

In light of Senate Bill 136 and Senate Bill 180, it is impossible to resentence appellant in compliance with the stipulated sentence. As such, the plea agreement cannot be fulfilled. Thus, we agree with appellant that she should be allowed to withdraw her pleas in the companion cases. Accordingly, we remand this matter for the trial court to vacate the plea bargain in the companion cases, and to allow appellant to withdraw her no contest pleas. The court shall conduct further proceedings as necessary.

## DISPOSITION

Appellant's sentence is vacated and this matter is remanded for further proceedings as follows:

### For case Nos. PCF335313 and PCF335315

In case Nos. PCF335313 and PCF335315, the stipulated sentence can no longer be imposed in light of Senate Bill 136 and Senate Bill 180. The trial court shall vacate the plea bargain and allow appellant to withdraw her no contest pleas. The court shall conduct further proceedings as necessary.

**For case No. PCF335314**

In case No. PCF335314, the jury's true finding regarding the gang enhancement is reversed. After the filing of the remittitur in the trial court, the People shall have 30 days in which to file a written election to retry appellant on the gang enhancement allegation. If they do not timely file such an election and/or do not bring appellant to retrial within the time set forth in section 1382, subdivision (a)(2)—60 days unless waived by appellant—the trial court shall proceed to resentence appellant. When appellant is resentenced, the court shall strike the enhancement imposed under section 667.5, subdivision (b). Following resentencing, the court shall forward a new abstract of judgment to the appropriate authorities.

In all other respects, appellant's judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:


POOCHIGIAN, J.


SNAUFFER, J.

37.